NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 07a0319n.06
Filed: May 8, 2007

No. 06-5988

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| KIMBERLY A. POTTER, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| COMMISSIONER OF SOCIAL SECURITY, | ) | WESTERN DISTRICT OF KENTUCKY |
| | ) | |
| Defendant-Appellee. | ) | |

**Before: ROGERS and COOK, Circuit Judges; and O'MALLEY, District Judge.**[*]

**ROGERS, Circuit Judge.** Kimberly A. Potter appeals the district court's decision affirming the Commissioner of Social Security's denial of Potter's application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act. Potter claims that she has mental impairments that render her disabled. The ALJ's decision adequately states why he found that Potter's condition did not meet or equal a listed impairment and that work exists in the national economy that accommodates Potter's residual functional capacity. Because the Commissioner's conclusion that Potter is not disabled is supported by substantial evidence, the judgment of the district court is affirmed.

---

[*]The Honorable Kathleen McDonald O'Malley, United States District Judge for the Northern District of Ohio, sitting by designation.

1

Potter filed for SSI benefits on August 6, 2003. Potter claimed that she was unable to work because of her learning disability.[1] Potter received a hearing before an ALJ in 2005. The ALJ found that Potter's "learning disability and borderline intellectual functioning" were severe impairments. However, the ALJ concluded that Potter's impairments did not meet or medically equal a listed impairment that entitled Potter to an irrebuttable presumption of disability. The ALJ further concluded that, based on Potter's residual functional capacity, Potter could perform a substantial number of jobs requiring "light exertion" and was therefore not disabled. Potter's internal appeal was denied, and Potter then appealed to the district court. A magistrate judge issued a report and recommendation that was adopted by the district court over Potter's objections.

At the time the ALJ issued his decision, Potter was twenty-seven years old. Potter claimed that she had been disabled since January 1, 1982. Potter and her mother, Shirley Ann Nelson, testified that they believed that Potter's mental impairments started when Potter experienced seizures as a small child. Although the medical evidence in the record does not address the cause of Potter's mental limitations, the record does establish that Potter has below-average mental ability.

Potter submitted extensive school records documenting her enrollment in special education classes as a result of her learning disability. The record also includes three separate intelligence tests performed on Potter. The first was performed when Potter was thirteen by Dr. Mark Schachter, a neuropsychologist. Dr. Schachter found that Potter had an IQ of 80, which placed her in the

---

[1]Potter also claimed to suffer from occasional migraine headaches and back pain. Neither of these limitations are at issue in this appeal.

"borderline to low range of intellectual functioning." Potter was again tested when she was sixteen years old. At that time, school psychologists assessed Potter's IQ as 81, which they termed "a borderline range." This evaluation also concluded that Potter was of "Low Average to Borderline [intellectual] ability." Potter's third, and most recent, IQ assessment was performed by Dr. Ollie C. Dennis for the Social Security Administration in connection with Potter's current application for benefits. Dr. Dennis assessed Potter's IQ as 69.

Dr. Dennis concluded that Potter "functioned within the 'extremely low' range of intelligence." Dr. Dennis also concluded that Potter was "moderately limited" in her ability to function due to her intellectual limitations, and in particular that she would have "moderate difficulty understanding, retaining, and following written and oral instructions"; that she would have "mild difficulty" sustaining attention to perform repetitive tasks; that she would be "mild[ly] to moderately impaired in her ability to relate to co-workers and supervisors"; and that "[h]er ability to tolerate the stress and pressure of daily work activity was considered to be mildly to moderately limited."

Dr. Edward Stodola and Dr. Stephen Scher, state agency psychological consultants, both reviewed the record to assist the ALJ in evaluating Potter's application for benefits. Both reviewing consultants concluded that Potter's condition did not meet or equal the elements of the mental retardation listing. In evaluating Potter's functional limitations, both consultants concluded that Potter was mildly limited in her daily living activities and social functioning; that she was

moderately limited in her ability to maintain concentration, persistence, or pace; and that she had no episodes of decompensation.[2]

In her application for benefits, Potter indicated that she had no problems taking care of her personal hygiene; that she prepared her own meals and did the dishes; that she shopped for personal items; that she attended church, dated, went to the movies, and occasionally bowled; and that she was the sole care-giver for her two-and-a-half-year-old daughter. At Potter's hearing, she testified that she attended school through the twelfth grade, but that she only received an "individual education program" (IEP), which "simply states I was there," instead of a regular diploma. Potter also testified that she had trouble functioning independently because she needed "somebody there reminding me of what has to be done." As examples of this she said that she sometimes forgot to feed and care for her daughter and that she would often forget that food was cooking and would let it burn. Potter also testified concerning her work history. She reported working at numerous unskilled jobs for brief periods of time. She testified that she had to leave or was fired for each job because she "wasn't working fast enough, and [] would forget what [she] was doing" or because she was otherwise unable to do the work.

At the hearing, the ALJ next heard testimony from a vocational expert. The ALJ asked the expert the following hypothetical,

---

[2]"Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00 (C)(4).

> [A]ssume a[n] 27 year old lady with a apparently 12th grade education who has a number of jobs that she's worked at part-time or for brief periods less than two-months. Any job that she's worked full-time that's been less than two months . . . . I want you to assume that she is moderately restricted in her ability to maintain attention and concentration for extended periods of time. She could do simple routine tasks. I want you to assume that she should be restricted to jobs that require few changes in the work setting. Based on those assumptions, would there be any jobs existing in the state of Kentucky and the United States that such a person could perform or not?

The vocational expert's response was, "Yes, sir. Just based on that, simple type of bench assembly or hand packing. Production labor positions like polishing and debriding and separating . . . excess material for molded pieces." The expert estimated that, assuming a "light" exertional level, the hypothetical person could perform nearly one million jobs available in the national economy.

When the ALJ altered the hypothetical and asked the vocational expert to assume that the individual "has a very poor ability to retain instructions, whether simple or detailed, and that she has poor ability to maintain pace on a sustained basis," the vocational expert then concluded that such conditions would not be consistent with "competitive employment."

The final witness at the hearing was Potter's mother, Shirley Ann Nelson. Nelson testified about Potter's early childhood illness. Nelson also testified that she continuously had to remind Potter to do things including to care for her daughter until the child was old enough to communicate her needs and that Potter wanted to work but could not because of her need for constant supervision. Nelson also elaborated on Potter's educational background and limitations.

The ALJ's opinion noted that Potter had filed two previous applications for SSI. The ALJ stated that he was bound by the findings of the previous ALJs in those applications, "absent

evidence of improvement or deterioration in a claimant's condition." However, the ALJ noted that "[t]he prior hearing decision was not available for review," and made no additional reference to the earlier decision in his opinion. After summarizing the evidence, the ALJ concluded that Potter's "learning disability and borderline intellectual functioning" impairments were severe, but that they did not meet or medically equal a listing. The ALJ did not find Potter's allegations credible as to the extent that she was precluded from "performing exertional work-related activities," because those allegations were inconsistent with Potter's description of her daily activities. The ALJ also chose to rely on Potter's two earlier IQ scores rather than one more-recent, lower score. The ALJ also relied on the consultant evaluations, which indicated that Potter's mental limitations did not qualify as a listed disability. Finally, the ALJ relied on the testimony of the vocational expert in finding that, while Potter's "ability to work is compromised at all exertional levels," given her residual functioning capacity, Potter was "capable of making a successful adjustment to work that exists in significant numbers in the national economy." Accordingly, the ALJ found that Potter was not disabled.

The ALJ's determination that Potter was not disabled was supported by substantial evidence. The hypothetical posed by the ALJ to the vocational expert included a description of Potter's limitations as supported by the evidence in the record and therefore provided substantial evidence to support the ALJ's finding that Potter was able to perform a significant number of jobs available in the national economy. Similarly, the ALJ's decision that Potter's allegations regarding her limitations were not fully credible was supported by substantial evidence. Finally, the ALJ's

conclusion that Potter's learning disability and borderline intellectual functioning, while severe, did not meet or equal the listing for mental retardation is supported by evidence in the record.

This court reviews the district court's conclusion in a social security case de novo. *Crum v. Sullivan*, 921 F.2d 642, 644 (6th Cir. 1990). However, the court reviews the underlying findings of the Commissioner to determine whether they are supported by substantial evidence. 42 U.S.C. § 405(g); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997).

Potter's primary argument on appeal is that the ALJ erred when he found that Potter had a "high school education," and, as a result, that the assumption that Potter had a "12th grade education," rendered the expert opinion relied on by the ALJ at step five of the disability evaluation process unreliable.[3] At step five of the sequential evaluation process, the ALJ must determine whether the claimant's impairments prevent her from "making an adjustment to any other work." 20 C.F.R. § 416.920(g). In so doing, the ALJ is to consider the claimant's "residual functional capacity . . . together with [her] vocational factors ([ ] age, education, and work experience)." *Id*. In assessing the availability of "other work" that the claimant can perform, the ALJ commonly relies on the testimony of a vocational expert who is asked a hypothetical question based on the limitations and abilities of the claimant. *See Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 630 (6th Cir. 2004).

_____

[3]In evaluating whether a claimant is disabled, the Commissioner is to consider, in a five-step sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. § 416.920(a). All of Potter's arguments related to the ALJ's conclusions at either step three or step five.

In this case, the ALJ's hypothetical asked the vocational expert to assume an individual "with a[n] apparently 12th grade education." Potter argues that because the record clearly shows that she did not obtain a regular high school diploma, and because her actual educational abilities are clearly lower than what is indicated by a high school educational level, the vocational expert's conclusions in response to the hypothetical are invalid. The Commissioner concedes that Potter's educational abilities are not accurately represented as high school level because "it is undisputed that [Potter's] language and math skill ranged from the third to fifth grade levels." However, the Commissioner correctly notes that Potter's argument fails because the reference to Potter's education was not material to the ultimate conclusion that she was not disabled.

The basis of Potter's disability claim has little to do with her level of formal schooling. Rather, the material issue is the degree to which her current mental impairments prevent her from functioning in a work environment. Potter argues that her failure to succeed at past jobs proves that she cannot perform even simple light assembly positions such as "bench assembly or hand picking." However, Potter's explanation of why she has been unable to function at jobs involving "simple routine tasks," like those identified by the vocational expert in response to the hypothetical, have nothing to do with her level of formal educational. For example, as proof of her inability to do bench assembly work her brief points to her testimony that she was unable to work as a sandwich maker because she "wasn't working fast enough." Similarly, her brief argues that Potter could not do hand picking jobs because at her previous job bagging apples "she could not keep pace or make the decisions to place 'good' apples in bags." In response to the vocational expert's suggestion that she

could do polishing jobs, Potter's brief notes that she "was fired from cleaning a motel room []

because she could not make the bed properly and was slow." Potter does not offer any connection

between her level of formal schooling and the evidence that she performs simple, unskilled tasks too

slowly and exercises poor judgment.

Furthermore, the full text of the vocational hypothetical itself makes it clear that the mistaken

reference to an "apparently 12th grade education" was not material. The rest of the hypothetical

addressed Potter's non-education mental limitations, which are directly relevant to the kinds of

"simple" tasks that the ALJ concluded Potter could perform. The hypothetical noted that she had

worked only "brief periods less than two months" and asked the expert to assume that "she is

moderately restricted in her ability to maintain attention and concentration for extended periods of

time . . . . [and] that she should be restricted to jobs that require [] few changes in the work setting."

It is precisely these kinds of limitations on Potter's abilities that are material to determining whether

she could in fact perform even "simple" jobs, regardless of what her level of formal education may

have been. Because as a whole the ALJ's hypothetical sufficiently presented Potter's relevant mental

limitations, the ALJ's reference to an apparent twelfth-grade education was harmless.[4] *See Colwell v. Chater*, No. 95-6179, 1996 WL 557773, at * 3 (6th Cir. Sept. 30, 1996) (unpublished).

Substantial evidence in the record supports the ALJ's determination that Potter was capable of performing "simple routine tasks" and the ALJ's rejection of Potter's allegations to the contrary. The ALJ's assessment of Potter's residual functioning capacity is supported by the opinions of Drs. Stodola, Scher, and Dennis.

Dr. Stodola stated that Potter was "mentally able to understand[,]remember[, and] carryout simple instructions; [] relate adequately in most settings; [and] tolerate the changes and pressures of a routine setting." Dr. Stodola and Dr. Scher concluded that Potter was "moderately limited"[5] in her ability to carry out detailed instructions, her ability to maintain concentration for extended periods of time, and her ability to respond appropriately to changes in the work setting. Both psychological consultants found that Potter was "not significantly limited" in seventeen other areas

---

[4]Although we do not find that the ALJ's error in describing Potter's education level as an "apparently 12th grade education" was so material as to necessitate reversal or remand, we prefer that ALJs exercise greater precision in the formulation of hypothetical questions. Because a vocational expert's response to a hypothetical question can constitute substantial evidence to support an ALJ's decision if the question "accurately portrays [the claimant's] individual physical and mental impairments," *Varley v. Secretary of Health & Human Services*, 820 F.2d 777, 779 (6th Cir. 1987), the accuracy of such hypothetical questions is often a critical issue in these cases. A greater degree of care taken at the administrative level in crafting hypothetical questions not only increases the likelihood of correct determinations, it saves unnecessary disputes if the case is later appealed.

[5]These ratings were made on a form with three choices: not significantly limited, moderately limited, or markedly limited.

of mental functioning. Dr. Dennis found that Potter was "moderately limited in her ability to function as a result of deficits in cognitive, adaptive, and academic skill."

Potter argues that her testimony and the testimony of her mother concerning her functional limitations, as well as Potter's previous failed attempts at simple routine jobs, show that she does not have a sufficient residual functional capacity to work at any job. While there does appear to be substantial evidence to support Potter's contentions, the question on review is not whether substantial evidence, or even the weight of the evidence, supports Potter's position. Rather, this court is only asked to decide if the record includes substantial evidence to support the Commissioner's determination. *See Johnson v. Sec. of Health and Human Servs.*, 948 F.2d 989, 992 (6th Cir. 1991). The evidence from Drs. Stodola, Scher, and Dennis clearly offer substantial support for the ALJ's determination in this case.

Similarly, because Potter's allegations concerning the scope of her limitations are contradicted by the medical and expert evidence discussed above, substantial evidence supports the ALJ's credibility determination.

Finally, the ALJ's determination at step three of the sequential analysis, that Potter's mental impairments failed to meet or equal a listed impairment, is supported by substantial evidence. Potter argues that her learning disability and mental impairments satisfied paragraph D of the mental retardation listing, and that she was therefore entitled to a presumption of disability. The relevant listing provides the following:

12.05 Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

. . .

D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.

To qualify for the listing under paragraph D, Potter must satisfy both the introductory requirements and at least two of the four criteria in the paragraph. Even assuming that Dr. Dennis's assessment of Potter's IQ as 69 satisfies the introductory criterion of a valid full scale IQ of 60 though 70, the ALJ identified substantial evidence in the record that supports the determination that Potter did not satisfy each of the criteria in subsection D. First, the ALJ found that Potter did not have "Marked restriction of activities of daily living," but instead he found that Potter's daily activities were only "mildly" limited. As evidence of this finding, the ALJ noted that Potter "attends to her personal hygiene, does household chores, laundry and watches television." Similarly, the ALJ found that Potter experienced only "mild" limitations in social functioning, as evidenced by her interaction with her daughter and boyfriend and her own statements that she attends church, goes

bowling, and visits with a neighbor. The ALJ determined that Potter had only "moderate" difficulties in maintaining concentration, persistence, or pace based on Dr. Dennis's conclusion that Potter had mild difficulty sustaining attention. Finally, the ALJ noted, and Potter does not contest, that the record contains no evidence of episodes of decompensation. The ALJ's finding as to each of the paragraph D criteria is further supported by the reports of both psychological consultants who made the same criteria determinations based on their review of the record.

Because substantial evidence in the record supports the ALJ's decision to deny benefits, the judgment of the district court is affirmed.